**WO**

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Mohamed Hamze, | ) | No. CV-05-1315-PHX-FJM |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Bank of America, | ) | |
| Defendant. | ) | |

This court has before it defendant's motion for summary judgment (doc. 18), plaintiff's response (doc. 20), and defendant's reply (doc. 26).

**I**

Plaintiff began his employment with Bank of America (the "Bank") in 1995 as a collector, for which he was paid approximately $17,000 per year. He was consistently promoted and at the time of his termination he served as a Risk Operations Unit Manager, earning an annual salary of approximately $91,000. Pursuant to the Financial Action Task Force, an international anti-money laundering organization, the Treasury Department's Financial Crimes Enforcement Network, and the Patriot Act, the Bank has a duty to pay special attention to, among other things, suspicious transactions involving international wire transfers. As part of its risk management and regulatory compliance programs, the Bank routinely conducts internal monitoring of randomly selected accounts to detect check kiting,

1  money laundering, fraud, or any other activity that may be in violation of federal banking
2  regulations. During the Bank's routine monitoring, the Bank's Data Security Unit and Anti-
3  Money Laundering Unit found suspicious activity in a personal consumer checking account
4  involving the movement of money between a United States bank account and overseas bank
5  accounts in Lebanon. During the course of the investigation, the Bank discovered that
6  plaintiff was the named accountholder of the account in question. The Bank also learned that
7  plaintiff, along with his brother, Khodar Hamze, had been purchasing used cars in the United
8  States, and then exporting them for resale in Lebanon. Plaintiff indicated that he opened a
9  personal consumer account for the purpose of receiving wire transfers for this business. The
10 funds, which totaled over $314,000, were wired from Beirut and Tripoli, Lebanon, and
11 consisted of $249,844 in wire transfers during one month (from January 5, 2004 to February
12 6, 2004), as well as an additional $64,475 wired on a single day in April 2004. Plaintiff
13 stated that he was acting as an "unpaid agent," or the "middle person" of the operation, and
14 was facilitating the transfer of funds from Lebanon to his cousin in North Carolina, who was
15 in turn using the money to purchase cars in the United States to be sold in Lebanon.

16 Under the Bank's Code of Ethics, an employee is told that "[i]f you decide to pursue
17 additional employment, engage in an independent business venture or perform services for
18 another business organization, you must disclose such activities to your manager and obtain
19 his or her preapproval to avoid any potential conflicts." PSOF, Ex. 6, Ex. F at 4. Further,
20 an employee is instructed to "avoid all circumstances that could produce conflicts or the
21 appearance of conflicts between your personal interests and those of the Corporation." Id.
22 at 1. Conflicts of interest are "defined broadly" as "any situation in which you are engaged
23 in two or more activities or relationships that, to some degree, are incompatible. Such
24 situations might include activities, conduct or investments that could conflict with your duty
25 to Bank of America, or that could adversely affect your judgment or job performance." Id.
26 at 3.

27 The Bank contends that plaintiff neither sought permission from the Bank prior to his
28 participation in this outside business enterprise, nor informed the Bank of his involvement.

- 2 -

Plaintiff stated that he was not aware of his duty to inform the Bank of his involvement in his brother's business activities. He also contends that he discussed his involvement in the business venture with two supervisors, Tim Becker and Terry Ohr.

On April 20, 2004, after completing its investigation, the Bank terminated plaintiff due to a loss of trust and confidence in his leadership and judgment and because plaintiff disregarded Bank policies by failing to disclose his involvement in an outside business venture, and by using a personal account for the business, thereby "creating a direct misrepresentation of the true purpose for the activities of the account." Defendant's Motion for Summary Judgment at 4. The Bank contends that plaintiff's failure to abide by its well-known policies was especially egregious given his oversight responsibilities as Risk Operations Unit Manager. Plaintiff contends in contrast that he was terminated because the Bank improperly believed that he had committed a serious crime, such as terrorist activity, simply because of his race, religion or national origin. Plaintiff filed this action pursuant to the Arizona Civil Rights Act, A.R.S. §§ 41-1461 et seq., alleging discrimination on the basis of race, religion and national origin.[1]

**II**

To establish a prima facie case under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973), a plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subjected to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably. See also Leong v. Potter, 347 F.3d 1117, 1124 (9th Cir. 2003). The burden of production then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its decision. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093 (1981). If the employer successfully demonstrates

---

[1] The Arizona Civil Rights Act is "generally identical" to Title VII, and therefore "federal Title VII case law [is] persuasive in the interpretation of [the Arizona] Civil Rights Act." Higdon v. Evergreen Int'l Airlines, Inc., 138 Ariz 163, 166 n.3, 673 P.2d 907, 909 n.3 (1983).

1  a nondiscriminatory reason, the burden then shifts back to the plaintiff to produce sufficient
2  evidence to raise a genuine issue of material fact as to whether the employer's proffered
3  nondiscriminatory reason is merely a pretext for discrimination. Id.

4        The Bank contends that plaintiff cannot establish a prima facie case of discrimination
5  because he cannot establish that similarly situated employees outside his protected class were
6  treated more favorably. In order to satisfy this element of the prima facie case, an individual
7  seeking relief "must demonstrate, at the least, that they are similarly situated in all material
8  respects." Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006). Plaintiff identified two other
9  Bank employees in management positions who had outside business interests but were not
10 terminated, although he could only provide the name of one of these employees. PSOF ¶ 23.
11 These individuals, however, are not similarly situated to plaintiff "in all material respects."
12 Even if we assume that these employees engaged in outside business ventures, there is no
13 allegation that either employee failed to inform the Bank of such business interests, or
14 otherwise violated Bank policies. Plaintiff's ground for termination was not that he simply
15 had an outside business interest, but that he failed to disclose this outside interest and obtain
16 preapproval, as required by Bank policies. Therefore, plaintiff has failed to make the
17 minimum showing necessary to establish that these coworkers were similarly situated, and
18 as a result he is unable to establish a prima facie case of discrimination. See Moran, 447 F.3d
19 at 755. Accordingly, plaintiff's discrimination claims must be dismissed.

20       Though it is not necessary to our decision, we find unavailing plaintiff's argument that
21 because he believed that his outside business activity did not present a conflict of interest,
22 he was not required to disclose the activity or seek preapproval. The Bank's policy, however,
23 requires an employee to "disclose such [outside business activity] to [a] manager and obtain
24 his or her preapproval to avoid any potential conflicts." The notice requirement exists
25 independent of a finding of an actual conflict of interest. Further, we also note that the
26 questions posed by the investigator regarding plaintiff's religion, his national origin, his
27 citizenship status and his political affiliations directly related to the subject of the
28

- 4 -

1  investigation, namely the transfer of large sums of money between international accounts.
2  These questions do not rise to the level of direct evidence of discriminatory animus.

### III

Therefore, **IT IS ORDERED GRANTING** defendant's motion for summary judgment (doc. 18).

DATED this 30th day of June, 2006.

*Frederick J. Martone*
Frederick J. Martone
United States District Judge

- 5 -